MILDRED SMITH AND M. C. TAYLOR V. STATE.

No. 25061. February 7, 1951.
Rehearing Denied June 27, 1951.

254

■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

Hon. E. Harold Beck, Judge Presiding.

■■■■

*Carney, Carney & Mays*, Atlanta, for appellants.

*George P. Blackburn*, State's Attorney, Austin, for the state.

BEAUCHAMP, Judge.

Appellants were convicted for the murder of Wash Allen and sentenced to seven years in the penitentiary.

Appellants were jointly indicted by the grand jury of Cass County at the December term, 1948, with the offense of murder with malice by hitting and beating Wash Allen with a wrench handle. The homicide occurred on a country road between Atlanta and Bloomburg, in Cass County, on November 3, 1948. The state relies for conviction largely upon confessions signed by the defendants shortly after the homicide. Both are Negroes, about twenty-six years of age at the time of the homicide, and were G.I. students in a training school in the town of Atlanta.

Taylor did not testify at the trial. His co-defendant Smith tesified in detail that he and Taylor had been robbed of their money by deceased, Wash Allen, on the previous day, through the use of crooked dice in a crap game. After Allen had won their money the three went together to Texarkana, where they visited drinking places and returned to Atlanta later in the evening and had supper together. They then drove the deceased to the place of the homicide while insisting that the deceased

return the money which he had won from them in the crap game. The story then told by the appellant Smith, the only witness who testified on the subject, is quite at variance from his written confession. He exonerated his co-defendant who, he said, was asleep in the car when he and the deceased got into a fight resulting in the killing. This occurred late at night. From the state's evidence it is revealed that the two went to a Negro home in the country about two o'clock, spent the rest of the night, and returned to the school the next morning. The body of deceased was found about daylight and, upon investigation, the officers went to the school, arrested appellant Smith and took charge of the car driven by him and Taylor. They found blood in the car, also a piece of bone, which increased their suspicions. Smith was taken to the scene of the tragedy and later in the morning both he and Taylor signed the confessions first given to officers. A few days later they signed confessions which more fully detailed the facts, according to the state's evidence.

Taylor did not testify and we find no particular attack made on his confession. In Smith's testimony he admitted signing the statement, but declared that he did not know what was in it. He says he gave facts not included, but he made no claim of being abused or mistreated on either occasion. He gave evidence which raised an issue as to the voluntary nature of the confession. Investigating officers were called by the defendants, who testified that both defendants had made statements to them separate and apart from the prosecuting attorney who took the confessions, and stated the defensive maters now relied upon which are not found in the confessions.

We need not comment on the strength of this evidence. The issue as to the voluntary character of the statements was properly submitted to the jury in the court's charge and their finding is conclusive.

We cannot say that the jury had to rely upon the confessions alone for sustaining evidence. Smith's testimony hardly raised a defensive issue. In his claim of self-defense he told of a crap game and of the determination of the two defendants to get their money back. He describes the seating of the parties in the car at the time the fight arose. He was the driver, deceased was on the front seat to his right, and Taylor in the rear seat asleep. He then says:

"* * *. As to why we stopped the car down there, the lights were kinder acting bad on the car and the argument was pretty

hot, and I figured he might do something to me— the lights were getting bad. Wash was cursing me and I told him he had been using crooked dice on me but he never did own it, but still he wanted to fight, and that is the way it started up.

"When I got out of the car I got out on the left hand side, and Wash got out on the right hand side. The car was headed south, coming straight down the road. The fight was fixing to come off when we got out of the car because he cussed and said he was not going to give my money back, and I started trying to find something to fight with. I opened the door and got out and started around the front and he opened the door on the right hand side, and when he did I went back and tried to find something to hit him with. I was on the right hand side and had not got plumb around there then. As I come around the car he wasn't saying nothing but cursing me a little bit. When I went back to the car—I was in front when he opened the door on the left hand side, and when he did that I went back to the car to find something to fight with—I didn't have anything but my fist; and then he started at me, looked like he was going in his pocket, and I hit him with the wrench. When I got hold of the wrench it was laying back there between the seats with some more wrenches. I couldn't see—it was black dark. I just felt over between the seats and felt it and pulled it out. When I got the wrench Walsh didn't have anything—I could not see good, but he started in his bosom or pocket one, and I clamped him then. When he started in his pocked he said what he was going to do, that he was going to kill me, cut my throat. When he told me that and put his hand in his pocket, I fought, I hit him then, hit him twice. I didn't knock him down the first time and I hit him again. After he fell I didn't hit him any more. I didn't know he was dead then, I didn't think he was dead. I didn't intend to kill him but knock him off of me. I would not have hit him at all if he had not been coming on me and threatening me with a knife."

He then said he did not intend to kill him and rob him, but after he had knocked him down he thought about their money and figured on getting it back. He says he got back $53.00. He kept $20.00 and gave $33.00 to Taylor.

The witness had stated that he had no money following the crap game, and could not get any in Atlanta. Officers testified, however, that they took $47.00 from him the next morning. The jury had this evidence before them.

Smith testified as to his knowledge of the dangerous character of the deceased and his fear of him. This reputation seems to be well substantiated by the evidence of a great many witnesses. The deceased had frequently been in the clutches of the law. Both appellants established good reputations, which reasonably accounts for the light sentence given them by the jury for the offense presented by the state.

Appellants' first complaint, in their brief, is based on the failure of the court "* * * to charge the jury as to the presumption from the point of a deadly weapon in the hands of the deceased." We find no evidence giving rise to this charge. If the evidence shows he had a knife, it does not contain evidence of its deadly character.

Their second complaint is based on the contention that the jury's verdict was uncertain. It reads as follows: "We, the jury find the defendants, Mildred Smith and M. C. Taylor guilty as charged and assess their punishment at 7 years in the penitentiary."

The holdings of this court have been consistently against the contention and we are not impressed with the argument as to its uncertain character. Appellants have cited no authorities to sustain them and we are reluctant to overrule the long line of holdings of this court on the subject.

The third ground insisted upon in the brief is based upon complaints that the prosecuting attorney, in cross-examining character witnesses, asked about specific acts of law violation on the part of appellant Smith. The questions asked were improper and the court sustained objections and instructed the jury not to consider the same. Bill of Exceptions No. 6 recites that after giving this instruction to the jury the court "* * * allowed the State to introduce in evidence before the Court a judgment of guilty against the defendant Smith * * *" in the misdemeanor case. The brief discloses that this was presented to the court out of the hearing of the jury and was never allowed to be introduced as evidence in the case. The district attorney explained that he wanted to show his good faith in asking the question. If he felt that he was placed in an improper light before the court he was justified in making himself understood in a manner which in no wise affects the defendant's standing before the jury.

Appellants' fourth complaint treated in the brief relates to Bill of Exceptions No. 3 which complains of argument made by the county attorney. The court qualified this bill and as qualified it does not present error.

The fifth complaint relates to the refusal of the court to permit the introduction in evidence of a pair of crooked dice. There is no claim that they were the dice used by the deceased but they were presented for the purpose of showing that such dice are made. The state admitted the possibility. The evidence introduced by appellants, and not denied by the state, is overwhelmingly in favor of the contention that the deceased had such dice—and that he used them. We do not think that the introduction of the dice sought would have any probative force in the matter before the jury.

The sixth complaint treated in their brief presents the contention that the court erred in refusing to permit the witness Homer Carter to testify as to statements made by the defendant Smith after his arrest. These statements, it is said, are different to those contained in the written confession. It was the theory of the trial court that they were self-serving statements made by appellant Smith to an officer. Carter was the city marshal of Atlanta and made the arrest.

We are unable to see how a statement made to one officer could contradict a statement made to another officer in writing, simply because they were not consistent. The evidence given by appellant Smith on the witness stand is not wholly consistent. It is observed that while he could not see the wrench handle in his hand, in the utter darkness, he could see the deceased reaching into his pocket or bosom for a knife.

Appellant's eighth contention is based on a complaint as to the form of the charge on self defense. In our opinion, in view of the evidence of the appellant Smith, as herein above quoted, it is hardly incumbent upon the trial judge to give a charge on self defense. Under his own testimony he was provoking a difficulty and was approaching the deceased with an instrument— which proved to be the cause of the death—before the deceased reached for his knife, or pistol as the case might have been. Smith provoked whatever action the deceased took to defend himself, according to his own testimony.

The ninth complaint treated in appellant's brief presents nothing serious for our consideration.

In the seventh complaint treated in the brief, complaint is made because the court refused to require the state's attorney to furnish to counsel the various confessions and exhibits held by the state's attorney, prior to anunouncing ready for trial, in order that they may inspect them in preparation for the defense. This is based upon Bills of Exception Nos. 1 and 5.

We know of no statutory requirement and no holding of this court which would require that the prosecution present to the defense the written confessions and exhibits to be used in the prosecution. The bills cannot be legally sustained.

The writer wishes, however, to recognize the unfairness which sometimes confronts one on trial under such circumstances. If it were within the power of this court to make the law this writer would be ready to assume the responsibility. We are, however, in duty bound to follow the law as the legislature has given it to us.

We find no reversible error in the trial of the case and the judgment assessing to each appellant a term of seven years in the penitentiary is affirmed.

### ON MOTION FOR REHEARING.

MORRISON, Judge.

Appellant presents a most able brief on motion for rehearing, and this court will attempt to discuss the points raised therein in the order presented.

Appellant first complains of our holding that there was no evidence giving rise to the presumption based upon the use of a deadly weapon in the hands of deceased.

It will be noted that the terms of Art. 1223 provide that the weapon, or means *used* by the party, gives rise to the presumption. It therefore follows that mere possession of a deadly weapon does not raise the presumption, Cain v. State, 154 Tex. Cr. R. 284, 226 S.W. 640, and Spencer v. State, 59 Tex. Cr. R. 217, 128 S.W. 118. Smith did not testify that he saw a knife in the hands of deceased. The officer who searched deceased testified that he found the knife in his pocket and closed.

Viewing the evidence as we do, the question of the deadly character of the knife passes out of consideration.

A proper charge on self-defense was given, which we feel is all that the evidence required.

Appellant next complains of the overruling of his motion for a new trial on the grounds that the verdict is uncertain, vague, and indefinite, because each defendant was found guilty, and the jury assessed "their punishment at 7 years in the penitentiary."

Our original opinion cites no authority and states that those cited by appellant do not sustain him.

A distinction has existed so far as we can determine since 1896 between joint verdicts in cases involving a monetary fine and those where a period of confinement is assessed as the sole punishment.

In Mootry v. State, 35 Tex. Cr. R. 450, 33 S.W. 877, decided in 1896, the court reviewed the prior decisions and held that a verdict which assessed "their punishment at death" was certain and, therefore, not vague and indefinite.

This seems to have been followed in cases involving punishment by a term of confinement in Polk v. State, 34 S.W. 633, where the jury assessed "their punishment at life imprisonment"; in Davidson v. State, 35 Tex. Cr. R. 495, 50 S.W. 365, wherein the verdict "assessed their punishment at 2 years"; and in Good v. State, 66 S.W. 1099, wherein the verdict assessed "their punishment at 3 years," and each was held to be certain.

In the discussion found in 42 Texas Jurisprudence, Sec. 367, as well as in some of the decisions of this court, it would appear that the test of the certainty of a joint verdict was whether the case was a felony or a misdemeanor. Only generally is this true since usually the punishment in misdemeanor cases is thought of as being a fine, while felonies usually carry with them punishment of a term of confinement.

A more accurate distinction, which we now point out, would be between cases in which a monetary fine was at least a part of the punishment and those where the punishment was a term of confinement.

The reason for this distinction is that a sum of money is readily divisible, while a term of confinement is not. This hinges

upon the prime question of determining what was in the minds of the jury.

In addition to what has been said in our original opinion on appellant's Bill of Exception No. 6, it will now be observed that such bill seeks to complain of two separate and distinct things and is, therefore, duplicitous and not to be considered, Granado v. State, 154 Tex. Crim. Rep. 519, 228 S.W. 2d 530, and Smithwick v. State, 155 Texas Crim. Rep. 292, 234 S.W. 237.

If the matters set out in appellant's Bill of Exception No. 3 actually transpired, they would present this court with a serious question. However, the qualification of the trial court states specifically that they did not occur. Appellant having failed to except to the qualification, this court has nothing for review.

In addition to what has been said in our original opinion about appellant's Bill of Exception No. 7, we here observe that we know of no law authorizing the introduction of articles not shown to have been connected with the crime to be used for the purpose of comparison or for the purpose of conducting an experiment by the jury. Appellant's authorities do not support him.

Bill of Exception No. 9 complains of the trial court's refusal to allow appellant to ask his own witness, Carter, a leading question. The bill does not show surprise, that the witness was hostile or reluctant, or that his memory needed refreshing, which are the only exceptions generally recognized by this court. We uniformly have held this to be a question within the discretion of the trial court.

It is further observed that since the bill does not contain the answer which the witness would have given, it presents nothing for review, 4 Texas Jurisprudence, Sec. 219, p. 318.

Bill of Exception No. 10, by its terms, complains that his witness, Carter, was not permitted to reiterate statements made to him about which, according to the bill, he had just finished testifying. The bill does not disclose what the witness would have answered if he had been permitted to do so by the court; therefore, presents nothing for review.

Bills of Exception Nos. 1 and 5 complain that appellant was

not permitted to examine the confessions of the defendants before announcing ready for trial.

On original submission appellant cited this court no authority supporting his position. He now cites U.S. v. Coplon, 185 Fed. 2d 629. That case was reversed, among other reasons, because the defendant Coplon was not permitted to see certain documentary evidence introduced by the government against her. In the case at bar appellant was permitted, as is always done, to examine the confessions before they were introduced as evidence.

We have attempted to write on every point raised by appellant so that he may be assured that this court has given his case, as it does all cases, its very best attention.

Finding no reversible error, the motion for rehearing is overruled.