

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00480-CR

KEVIN ROY BECKSTRAND A/K/A                                    APPELLANT
KEVIN RAY BECKSTRAND

V.

THE STATE OF TEXAS                                                    STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1248503D

----------

## MEMORANDUM OPINION[1]

----------

Appellant Kevin Roy Beckstrand a/k/a Kevin Ray Beckstrand appeals his conviction for burglary of a habitation, for which he received a sentence of confinement of three years in the Institutional Division of the Texas Department of Criminal Justice. In his first of five issues, Appellant complains of the trial

---

[1]See Tex. R. App. P. 47.4.

court's failure to charge the jury on self-defense. We sustain his first issue, reverse the trial court's judgment, and remand the cause for a new trial.

## Background

The State alleged that Appellant, on or about July 26, 2011, intentionally or knowingly, without the effective consent of Erin Beckstrand, the owner thereof, entered a habitation with the intent to commit an assault. In a second paragraph, the State alleged that Appellant, on or about July 26, 2011, intentionally or knowingly, without the effective consent of Erin Beckstrand, the owner thereof, entered a habitation and attempted to commit or committed an assault.[2]

Before a jury, Appellant pled not guilty. After hearing the evidence, the jury found Appellant guilty as charged. The jury thereafter assessed Appellant's punishment at confinement for three years in the Institutional Division of the Texas Department of Criminal Justice.

## The Evidence

Appellant and Erin were married on April 8, 2006. They separated, and by late October 2010 Appellant had moved out of the family home. The divorce was not final until August 17, 2011, but they had entered into a mediated settlement agreement about three weeks before the events in question, pursuant to which Erin testified that she had possession of the house and all of Appellant's

---

[2]The State alleged alternate ways to commit the same offense of burglary of a habitation. Tex. Penal Code Ann. § 30.02(a)(1) (enters with intent to commit an assault), (3) (enters and commits or attempts to commit an assault) (West 2011).

possessions had been removed.  She said Appellant did not have keys to the house.  Appellant acknowledged that by July 26, 2011, Erin had a greater right of possession.

The parties had agreed and Erin acknowledged that Appellant had possession of the couple's two children for summer visitation for two weeks starting on July 24 or 25, 2011, until August 8, 2011.  Appellant had picked the children up from Erin's home on a Sunday afternoon.  Erin acknowledged Appellant had possession of the children for his two-week summer visitation on July 26.  Appellant had scheduled a camping trip to Colorado and Utah with the two children, his mother, and his father for July 27, 2011.  Appellant testified he purchased a gun on that Monday afternoon, which would have been July 25, 2011, because he planned on taking the children hiking and wanted the gun for protection against bears and moose.  Appellant said he had pepper spray as well because he thought it would be strong enough to repel a bear.  Appellant said he also borrowed a pickup truck because he did not think his regular car was a good vehicle for their planned trip.

### Appellant Discovers His Children are Missing and Describes His Efforts to Find Them

On July 26, 2011, which was a Tuesday, Appellant was unexpectedly called to the office for a meeting, so he arranged for Kyli Morgan, Erin's sister, to come to his residence and attempt to take the children to a dental appointment that he had cancelled but which he hoped was still available.  When Appellant

3

returned home around 10:00 a.m., Kyli and the children were not there, and Appellant's attempts to contact Kyli and Erin were unsuccessful.

After he returned from lunch around 1:00 p.m., Appellant received a text from Kyli informing him that Erin had instructed her not to return the children to him, so he called the police sometime between 1:00 and 2:00 p.m. Two officers came to Appellant's residence, and one of them telephoned Erin. Erin acknowledged a police officer called her around 1:30 p.m. Appellant expected the children to be returned to him after this. They were not returned.

Over the remainder of the afternoon, Appellant called Erin, her two sisters, her brothers, her mother, and her father about every hour until around 5:00 p.m., when he went to Erin's home, knocked, and rang the doorbell. No one answered, so he returned to his own residence for about an hour. Appellant then went to Erin's house a second time, but no one was there, so he went to the home of Noah Morgan, Erin's brother, which was only a couple of blocks away. When Appellant saw no cars in the driveway, he waited and again tried to call Erin, Noah, Kylie, and Erin's mother with no success.

Appellant then drove to Kyli's home in Denton. He acknowledged buying ammunition for his gun on the way to Denton. When Appellant determined no one was at Kyli's residence, he drove to Erin's mother's home in Plano, but he again determined no one was there. By that time, it was between 8:00 and 9:00 p.m. Appellant said he then stopped at a church to pray and thereafter drove to Grapevine to see his brother, whom he hoped would help calm him down. While

4

in Grapevine, Appellant called the police again, and he met with another officer. When asked why he called the police, Appellant answered:

> Because at that point I—like I said, I was beginning to think the worst that my—my children could be floating in some bathtub, they could be on a plane to Brazil or to Egypt or—you know, they had been missing at this point for over 12 hours.

By the time the officer left, Appellant said it was close to 10:00 p.m.

Appellant drove to Erin's home a third time and arrived around 10:30 p.m. The house appeared to be dark, and the blinds were drawn, but the lamp next to Erin's bed was on. He rang the doorbell two to four times and knocked on the door intermittently as well. Appellant testified, "Initially I thought I saw when I first was walking up to that—to the house, the—there is—above the front door there's a window with blinds, and I thought I saw a finger peek through." He thought he saw a movement in the blinds consistent with someone looking at him standing at the door. He then went to see if the lights were on in the children's upstairs bedrooms and determined they were not.

By this point, according to Appellant, he was in the backyard. "I—I was feeling that I really needed to know where my children were. I felt like I had no other choice. I had like visions in my—in my head of my children being hurt, like I mentioned, or maybe they were drowned in a bathtub or—or something like that. So I—I really—I thought, you know, I legally own this home." Appellant picked up a landscaping rock in the backyard and threw it through the back door window. He reached through the door, unlocked it, entered the kitchen, turned

5

the lights on, and looked around. Appellant said he did not see anyone and did not say a word but went to the garage where he saw Erin's car, which meant to him either that she and the children were in the house or that she had gone with her sister in her sister's car.

### Erin's Testimony

Erin testified she was in the house taking a shower when she heard a loud banging. She denied hearing anyone ring the doorbell or knock at the door. After getting out of the shower, she heard movement downstairs, so she telephoned her brother. After calling her brother, Erin heard Appellant yelling that he was going to kill her and that he had a gun. Frightened, Erin hid in a closet and called the police. Erin denied giving Appellant permission to enter the house that night.

Erin said the children were with her sister that night. Erin admitted having told her sister, Kyli, not to return the children to Appellant that day. She acknowledged Appellant had called and sent her multiple texts that day and that she never responded to them. She admitted that he was looking for the children. She said she knew that Appellant had the right of possession of the children that day and that Appellant was upset with her. She never spoke with Appellant that day. Even after a police officer called her around 1:30 p.m., she never responded to Appellant. She said she was sufficiently concerned about Appellant that she asked her brother, Noah, to escort her home that night.

6

## Noah's Testimony

Noah, Erin's brother, confirmed he had spoken to Erin earlier on July 26, 2011. She had called and told him that Appellant had left multiple threatening messages on her voicemail and had repeatedly tried to contact her. Based upon what she told him, Noah was concerned about her and offered for her to stay with him that night, but she declined. He escorted her home at about 9:00 p.m., after a dinner that evening with her colleagues, to make sure her house was safe.

Noah lived about a half-mile from Erin. Around 10:00 or 10:30 p.m., she called him, panicked, excited, and scared, and asked him to come quickly, so he ran to his car and drove to her house as quickly as he could. In Erin's driveway Noah saw a Ford F-150 that he did not recognize.

As he opened his car door to step out, the garage door began to lift, and once it was fully opened, Noah saw Appellant. He knew Appellant had not lived in the house with Erin for about a year. Noah approached the garage, asked Appellant why he was there, and suggested to Appellant it was best if he left. Noah urged Appellant to leave and warned Appellant the police were on their way, but Appellant responded by yelling and cursing. Noah related what happened next: "I entered into the—the garage, you know, I again was urging him to leave, cops were coming. And I actually reached out to—I still had my keys in one hand, and I asked—you know, I think I grabbed one of his arms and

said, [']Come on, we need to leave, cops are coming, get out of here.[']  And that's where he attacked me."  Appellant hit him in the face with a closed fist.

Noah tried to tackle Appellant, but Appellant fell on top of him and continued to hit him.  Eventually Appellant let Noah up and said he was leaving.  Instead of leaving, Appellant hovered over Noah while Noah was still on his back, and Noah thought Appellant intended to attack him again.  Appellant kicked him in the head but then backed up enough to allow Noah to stand up.  Noah grabbed two bricks, one in each hand, threw one, and charged Appellant with the other.  Appellant dodged the brick Noah threw, but when he tried to strike Appellant with the second one, he managed to graze Appellant in the head.  Appellant then tackled him, and they ended up pinned between Erin's car and the house.  At some point Appellant got up and walked away, and Noah ran into the house, locked the door, looked for his sister, and called 9-1-1.  The police arrived fairly quickly.  Noah refused to go to the hospital; he acknowledged an ambulance took Appellant to the hospital.  Noah said that his niece and nephew were not in the house and that he had no idea where they were.

### Appellant's Version of the Altercation

Appellant described his encounter with Noah differently.  According to Appellant, he heard a car pull up, so he hit the garage door button to open the garage door.  He saw Noah coming toward him.  Noah asked him what he was doing.  Appellant responded several times by asking where his children were.  "He approached me very quickly.  He grabbed me, slamming me up the—up

8

against the side of my wife's car, and he jammed his forearm into my throat." Noah had him pinned up against the car, and Appellant again asked where his children were. Appellant said he felt pain in his throat. Appellant said he grabbed the arm that was against his neck, pulled it back, and then began punching Noah's head and face with both his hands. Appellant said he was defending himself. He thought he caught Noah by surprise, and he repeatedly punched Noah's face and head until Noah went to the ground.

Appellant stood over Noah with one foot on his chest and repeatedly asked where the children were and accused Erin and her family of kidnapping his children. Appellant stepped back and allowed Noah to get up, at which point Noah grabbed a brick and threw it at Appellant. Appellant dodged it. Noah picked up another brick, swung it at Appellant, and managed to skim the side of his head, causing a laceration. Appellant said he was "stunned," and Noah managed to get in several blows. Appellant said he pushed Noah over the hood of his wife's car, and they both got caught in the tight space between his wife's car and the wall. Appellant managed to retreat and leave the garage, after which he went to a neighbor's home and asked the neighbor to call the police. The police came, and an ambulance took Appellant to the hospital.

**Other Testimony**

Officer Joshua Russell testified that he responded to the scene where the altercation had occurred that night and that he searched the truck parked in the driveway for a gun which Appellant had told the officers on the scene was in the

9

truck. Officer Russell found the gun, an Ultra Star .9 millimeter handgun, either in the glove compartment or in the center console. Ammunition was in the magazine. He also found pepper spray in the holster. He did not believe a round of ammunition was chambered.

Appellant denied going into Erin's home with the intention to assault anyone and denied telling her, "I'll kill you" and "I have a gun." Appellant maintained he did not say a word after entering the house. Appellant also denied assaulting Noah. Appellant testified Noah assaulted him, and he defended himself. Appellant said he told the police a gun was in the truck. Appellant acknowledged Erin and her neighbors would not have recognized the pickup because he borrowed it.

On cross-examination, Appellant acknowledged he had previously testified that it was not normally in his character to do something like what he did that night, but he said he was referring to throwing a rock through a window. When asked if that was totally accurate, Appellant maintained it was. On further cross-examination after the court ruled that Appellant had opened the door by his testimony about his character, Appellant admitted being arrested in Denton County in October 2010 for interfering with public duties, evading arrest, and disorderly conduct, that two of the charges were still pending, and that he had spent twenty-seven days in jail in October 2010.

While at the hospital after the fight with Noah, Appellant gave a written statement to the police. Appellant wrote that he had vacation custody of his

children from July 26th until August 8th and that his wife's family was hiding the children from him.  Appellant wrote that he went to his wife's residence, rang the doorbell twice, and threw rocks at the back door five times until he gained entry.  Once inside, he went to the garage, found his wife's car there, and heard a car pull up, which he hoped was the police.  It was, instead, Noah, who approached Appellant and asked Appellant what he was doing.  Appellant then wrote:  "He put his hands on me and I proceeded to beat the shit out of him."  Appellant wrote that after he let Noah up, Noah picked up two bricks and threw them at him.  Appellant also wrote that the second brick had skinned the back of his head.

Regarding Appellant's written statement, Appellant testified that was actually the second statement he wrote.  Appellant said his first statement had been far more detailed, but he was given another piece of paper and was told to rewrite his statement.  Appellant said that after thinking about it, he decided he did not want to hurt Erin, so he left out the part about her kidnapping the children and wrote that he did not want to press charges against her or Noah.

The State also admitted portions of an email Appellant sent to Erin on August 19, 2011.  The admitted portions provided:

> [We know that your family was also behind more coneiving [sic]] deceitfulness and testimony to lawenforcement [sic] to try and get more serious charges filed against me.[3]  You have tried to destroy

---

[3]The portion actually provided to the jury begins in midsentence with "deceitfulness . . . ."  We provide the deleted portion of the sentence just for our own clarity.  We can only assume time-restraints explain the curious editing.

11

and discredit the wrong man and family. You should just consider that you and your famil[y's] intentions an[d] actions are pretty much under a federal investigation and this is no exaggeration. Be happy that you married a kind and loving man! I know I did violate a civil court order and even the fact that you did the same by hiding my kids from me was no excuse for my actions and I sincerely apologize. I had no idea you were home and I'm sorry if I alarmed you.

I would also appreciate [it if] you g[a]ve my sincere [and] kind regards to Noah. I hope he is okay and no lasting damage has come from our altercation! Please tell him I love him and am sorry for what went down between us. If I didn't feel this way about him I would seriously consider pursuing attempted murder charges against him. I had him completely subdued and when I relented and let him up, he attempted to smash my brains in not once but twice with bricks from my own home. He was just an in[n]ocent bystander of your dumb . . . stupidity and my training in self[-]defense!

I was certainly wrong for breaking into our home to reclaim property that rightly belongs to MY FAMILY! I will give you one more chance to do the right thing by my family[,] our children[,] and me. Your kindness and cooperation would really be appreciated. Try to be a decent and respectable person and do the right thing! I wish you knew the reputation you have with some parents at Woodland Springs Elem[entary]. You would be embarrassed and ashamed of yourself as I am that I once called you[] my wife and friend!

Regarding his email, Appellant denied at trial that he thought he was violating any court order. At the time of the events, he said, they had signed the mediated settlement agreement that provided she would get the house when the divorce was final and he would sign the deed of trust over to her, but the email was written a month later after reflection and after talking with his divorce lawyer. When asked by defense counsel why he wrote the part about not knowing Erin was in the house and being sorry he alarmed her, Appellant responded that at

12

the time he was frantic and worried about his children but, in retrospect, he felt bad about scaring her and that it was not something normally in his character to act like that. Regarding his statement that Noah was an innocent bystander, Appellant said that he thought Noah had nothing to do with the abduction of his children.

### First Issue: Alleged Charge Error on Necessity and Self-Defense

In his first issue, Appellant contends the trial court erred when it denied his request to instruct the jury on the defenses of necessity and self-defense. Appellant contends these defenses were raised by the evidence and the error was harmful. Appellant requested the jury be instructed on both necessity and self-defense.

### Generally

The court of criminal appeals has made it clear that a defendant has the burden of production of some evidence on each element of a justification defense, and it held that a defense is raised "if there is some evidence, from any source, on each element of the defense that, *if believed by the jury*, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007) (emphasis added), *cert. denied*, 553 U.S. 1059 (2008). The trial court neither weighs the evidence nor determines the credibility of the witnesses, including the credibility of the defendant, but must assume the evidence supporting the defense is credible. *Shaw v. State*, 181

S.W.3d 450, 452 (Tex. App.—Waco 2005), *aff'd*, 243 S.W.3d at 660, *cert. denied*, 553 U.S. at 1059.

On appeal, we review whether the evidence raises a defense of justification de novo as a question of law. *Shaw*, 243 S.W.3d at 658; *Shaw*, 181 S.W.3d at 452. We do not apply the usual rule of appellate deference to the trial court's ruling at this stage or at the stage of jury submission. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006); *Johnson v. State*, 271 S.W.3d 359, 367 (Tex. App.—Beaumont 2008, pet. ref'd). When reviewing de novo, we afford no deference to the trial court's determination and consider the matter as if we were the court of first instance. *See Tucker v. State*, 369 S.W.3d 179, 187 (Tex. Crim. App. 2012) (Alcala, J., concurring). We view, as does the trial court, the evidence relied on by the defendant to raise the defense in the light most favorable to the defendant. *See Bufkin*, 207 S.W.3d at 782; *Johnson*, 271 S.W.3d at 366, 367. If each element of a justification defense is raised by some evidence, the defendant is entitled to an instruction to the jury on that defense, regardless of whether the evidence supporting the defense is strong, weak, feeble, impeached, or contradicted, and even if the trial court is of the opinion that the testimony raising the defense is not credible. *Shaw*, 243 S.W.3d at 657–58 (citing Tex. Penal Code Ann. § 2.03 (West 2011)); *see Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007).

14

**Necessity**

Section 9.22 of the Texas Penal Code provides that a defendant's conduct is justified if he reasonably believes his conduct is immediately necessary to avoid imminent harm. Tex. Penal Code Ann. 9.22(1) (West 2011). For the reasons set out below, we hold the trial court correctly ruled Appellant did not meet the first element.

A defendant must have more than a generalized fear of harm to raise the defense of necessity; the harm must be "imminent," that is, the harm must be "immediate, something that is going to happen now." *Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd). Moreover, the mere possibility of harm does not suffice to support a necessity defense. *See Boushey v. State*, 804 S.W.2d 148, 151 (Tex. App.—Corpus Christi 1990, pet. ref'd), *cert. denied*, 502 U.S. 912 (1991). In most cases, whether a defendant was prompted to act by a reasonable belief will be a question for the trier of fact, but a defendant's belief that his conduct was immediately necessary to avoid imminent harm may be deemed unreasonable as a matter of law if the undisputed facts show a complete absence of evidence of immediate necessity or imminent harm. *See Graham v. State*, 566 S.W.2d 941, 952 n.3 (Tex. Crim. App. 1978); *Scroggs v. State*, 396 S.W.3d 1, 13 (Tex. App.—Amarillo 2010, pet. dism'd, untimely filed); *Arnwine v. State*, 20 S.W.3d 155, 159 (Tex. App.—Texarkana 2000, no pet.); *Wilson v. State*, 777 S.W.2d 823, 825 (Tex. App.—Austin 1989), *aff'd*, 853 S.W.2d 547 (Tex. Crim. App. 1993).

There was no evidence Appellant knew where the children were. Indeed, it was undisputed that he did not know where they were. That was the problem for which Appellant was seeking an answer. At best there was some evidence Appellant suspected someone was in the house. But there was no evidence the children were there or, more importantly, that they were in any danger anywhere. Appellant had left the children with Kyli, and Appellant's actions showed he thought Erin's side of the family had the children and were concealing them from him, but there was no evidence Erin or any other family member posed any type of physical threat to the children. Fears he expressed at trial that he had thought at the time he entered the house that the children might be drowned in a bathtub or on their way to Brazil or Egypt had no basis in any prior threats or conduct by Erin or her family. A generalized and unsubstantiated fear is not "reasonable" as a matter of law. *See Roy v. State*, 552 S.W.2d 827, 831 (Tex. Crim. App. 1977) (holding generalized fear of being robbed in high crime neighborhood did not entitle defendant, charged with unlawful possession of a firearm, to defense of necessity), *overruled on other grounds*, *Johnson v. State*, 650 S.W.2d 414, 416 (Tex. Crim. App. 1983) (holding defense of necessity not unavailable as a matter of law when prosecuted for unlawfully carrying a weapon on licensed premises), *overruled on other grounds*, *Boget v. State*, 74 S.W.3d 23, 31 (Tex. Crim. App. 2002) (holding self-defense not limited to when defendant charged with offense involving force against another); *Cyr v. State*, 887 S.W.2d 203, 206–07 (Tex. App.—Dallas 1994, no pet.) (concluding protester not entitled to necessity

16

instruction on basis he was acting to prevent illegal third trimester abortions where evidence showed only that there could have been late-term abortions being performed; no evidence of reasonable belief of imminent harm); *Thomas v. State*, 855 S.W.2d 212, 214 (Tex. App.—Corpus Christi 1993, no pet.) (same). We hold the trial court did not err by refusing an instruction regarding necessity.

## Self-Defense

Appellant contends that Noah assaulted him inside Erin's garage and that Appellant simply defended himself. Section 9.31(a) of the Texas Penal Code provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a) (West 2011).

The State responds that Appellant cannot rely on self-defense because self-defense requires the use of "unlawful" force. The State maintains Noah's use of force was lawful because he was trying to protect a third person and to protect a third person's property. Noah was at Erin's house at her request to protect her or her property from an intruder; consequently, the State argues Noah's use of force, to the degree he reasonably believed force was immediately necessary, was lawful. *See* Tex. Penal Code Ann. §§ 9.31(a) (self-defense); 9.33 (defense of third person); 9.41(a) (protection of one's own property); 9.43(2)(A) (protection of third person's property) (West 2011). The State

17

contends Appellant did not put on any evidence that Noah's use of force was unlawful.

We disagree with the State. The State is viewing the evidence in the light most favorable to the State. Evidence offered in support of a defensive issue is reviewed in the light most favorable to the defendant. *Trevino v. State*, 60 S.W.3d 188, 193 (Tex. App.—Fort Worth 2001), *aff'd*, 100 S.W.3d 232 (Tex. Crim. App. 2003). The State fails to assess Appellant's justification from Appellant's standpoint. Both a plea of justification based on necessity and a plea of self-defense must be assessed from the defendant's standpoint. *Trotty v. State*, 787 S.W.2d 629, 630 (Tex. App.—Fort Worth 1990, pet. ref'd). The question is what the actor reasonably believed. Tex. Penal Code Ann. § 9.31(a).

Appellant knew Erin was behind the disappearance of his children. But other than Kyli's text advising him of that fact, neither Erin nor any of her family members were responding to Appellant's calls or texts. Appellant had spent the entire day trying to locate his children without success. When Noah entered the garage and, according to Appellant, attacked him, Appellant said he defended himself. Although Appellant acknowledged Erin had a greater right of possession, Appellant's fight was with Noah, not Erin. There was no evidence Appellant knew why Noah was there, as he was not privy to Erin's calls to Noah that evening either about her fears based on Appellant's calls and texts during the day or her call to Noah requesting Noah to "come quick" when she heard noises downstairs after returning home. Nor is there any evidence that Noah

18

ever advised Appellant that he had been called by Erin to come defend her or that he was authorized by her to be there, much less to remove Appellant from the premises. Moreover, in Appellant's mind, he was still the legal owner on the mortgage, and the fact that Erin had taken his children gave him the right to enter the property. Noah acknowledged that when he confronted Appellant, Appellant asserted Appellant had the right to be there but Noah did not. The evidence was that in Appellant's mind, as between Appellant and Noah, Noah was the trespasser. In Appellant's mind, he was not in an indefensible position of committing an offense and being lawfully stopped by someone else. To the contrary, in his mind Erin and her family were in the indefensible position of having unlawfully kidnapped his children, Appellant was trying to get his children back, and Noah, Erin's brother, attacked him during his efforts to recover the children. *See Bennett v. State*, 726 S.W.2d 32, 38 (Tex. Crim. App. 1986) (stating jury first had to determine if deceased was justified in using deadly force against the appellant in defense of third party as viewed from deceased's standpoint and, second, whether the appellant, viewed strictly from the appellant's standpoint, reasonably believed the deceased was acting lawfully; further stating that if jury found that the appellant in fact did reasonably believe the deceased was justified, the appellant would have had no right to self-defense). The fact question for the jury was whether, when viewing the circumstances strictly from Appellant's standpoint, Appellant reasonably believed Noah was acting unlawfully. If the jury decided Appellant in fact did not

19

reasonably believe Noah's use of force was unlawful, Appellant would lose his right to self-defense. *See id.*

Additionally, the amount of force used has limits. *Boget*, 74 S.W.3d at 30. "[I]t has often been declared that in instances where force may be lawfully exercised it amounts to an assault and battery when the force used becomes excessive." *Mickle v. State*, 88 Tex. Crim. 405, 410, 227 S.W. 491, 494 (1921).

One version of the initial encounter between Appellant and Noah suggested Noah's initial force might have been excessive and, therefore, potentially unlawful. Once again, a fact question for the jury was whether, when viewed strictly from Appellant's standpoint, Appellant reasonably believed Noah's use of force was excessive and, therefore, unlawful. *See Bennett*, 726 S.W.2d at 38. Appellant testified at trial that Noah approached him quickly, grabbed him, slammed him against Erin's car, and jammed his forearm against his throat. If Noah's use of force, as described by Appellant at trial, was excessive, then it would have been unlawful, and Appellant would have been entitled to a self-defense instruction. Viewing the evidence in the light most favorable to the defendant, we cannot say as a matter of law that the amount of force Appellant described was not excessive. *See Trevino*, 60 S.W.3d at 193 ("An accused is entitled to an instruction on every defensive issue raised by the evidence whether that evidence is strong, weak, contradicted, unimpeached, or unbelievable.").

The State also argued that a defendant may not commit a crime and then use the victim's response to claim self-defense, citing *Westley v. State*, 754

S.W.2d 224, 230 (Tex. Crim. App. 1988), *cert. denied*, 492 U.S. 911 (1989); *Davis v. State*, 597 S.W.2d 358, 360 (Tex. Crim. App.), *cert. denied*, 449 U.S. 976 (1980); *Cline v. State*, 150 Tex. Crim. 586, 592, 204 S.W.2d 512, 516–17 (1947); *Williams v. State*, 120 Tex. Crim. 484, 486–87, 48 S.W.2d 304, 305 (1932); *Yarborough v. State*, 66 Tex. Crim. 311, 312, 147 S.W. 272, 272 (1912); and *Hernandez v. State*, 969 S.W.2d 440, 445 (Tex. App.—San Antonio 1998, pet. ref'd). The State maintains Appellant admitted committing the offense of trespass. *See* Tex. Penal Code Ann. § 30.05(a) (West Supp. 2014).

We are not persuaded that by committing a trespass, Appellant categorically forfeited all rights to self-defense. *Westley*, *Davis*, and *Hernandez* involved robberies where the case law expressly states that a robber has no right of self-defense against his victim. *Westley*, 754 S.W.2d at 230; *Davis*, 597 S.W.2d at 360; *Hernandez*, 969 S.W.2d at 442, 445. Appellant was not committing a robbery. Those cases are not controlling.

*Cline* and *Williams* both involved burglaries, but they also involved a burglary statute that expressly stated homicide was justifiable in "cases of burglary and theft by night." *Cline*, 204 S.W.2d at 516–17 ("In cases of burglary and theft by night, the homicide is justifiable at any time while the offender is in the building or at the place where the theft is committed, or is within reach of gunshot from such place or building."); *Williams*, 48 S.W.2d at 305 (quoting the same statute as the one in *Cline*, the court wrote: "The issue of self-defense was not raised. Deceased had the legal right to kill appellant to prevent the

burglary."). The use of deadly force in self-defense or in defense of property is now governed by sections 9.32 and 9.42 of the Texas Penal Code. *See* Tex. Penal Code Ann. §§ 9.32, 9.42 (West 2011). Homicide is no longer justifiable "at any time."

The State asserts *Yarborough* involved a trespass. Although a trespass was involved in *Yarborough*, the offense for which the defendant was convicted was aggravated assault. *Yarborough*, 147 S.W. at 272. In *Yarborough*, the landlord entered his tenant's property, loaded the tenant's cotton on the landlord's wagons, and, while attempting to leave, was confronted by the tenant's wife and daughter, who attempted to prevent the landlord from leaving. The landlord argued he was entitled to a self-defense instruction because the tenant's daughter tried to strike him with a scale beam. *Id.* The court wrote:

> The state's evidence amply supports the verdict, and appellant could not claim to have been acting in self-defense, as he was wrongfully on the premises, and was engaged in an illegal act–taking another's property without warrant of law–and if [the tenant's wife] and [his] daughter had used force to prevent them from taking the property, and used no more force than was necessary, they would have been justifiable in the law. Consequently the court, under the evidence, did not err in refusing to submit the issue of self-defense.

*Id.* Even *Yarborough* does not give a complainant the right to use more force than was necessary. We cannot agree with the State that as a matter of law Noah's use of force, when judged from Appellant's standpoint, was lawful. *See Bennett*, 726 S.W.2d at 37 (stating that the reasonableness of an accused's

22

belief that unlawful deadly force is being exerted against him must be judged from the standpoint of the accused at the instant the accused responds to the attack).

The State also appears to argue that even if Noah's use of force was unlawful, Appellant provoked Noah's use of unlawful force by trespassing on Erin's property and then refusing to leave. *See* Tex. Penal Code Ann. § 9.31(b)(4). A charge on provocation is required when there is sufficient evidence that (1) the defendant did some act or used some words which provoked the attack on him, (2) such act or words were reasonably calculated to provoke the attack, and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm on the other. *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998). All the elements are questions of fact, although provocation may be established as a matter of law. *Id.* (citing *Dyson v. State*, 672 S.W.2d 460, 463–64 (Tex. Crim. App. 1984) (appellant testified he wanted a fight); *Smith v. State*, 156 Tex. Crim. 253, 254–58, 240 S.W.2d 783, 784–86 (1951) (defendant killed deceased while attempting to recover money lost in a crap game)). We cannot say as a matter of law that Appellant remained in the garage as a pretext to injure Noah. *See Bennett*, 726 S.W.2d at 35–36.

Error properly preserved by an objection to the jury charge requires reversal "as long as the error is not harmless." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex Crim. App. 1984) (op. on reh'g). The presence of "*any* harm,

23

regardless of degree," is sufficient to require reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). For the reasons set out below, we hold that Appellant suffered some harm.

The State could have proven its case in one of three ways. First, the State could have proved its case by showing Appellant entered Erin's house with the intent to commit an assault. Second, the State could also have proven its case by showing Appellant entered the house and then committed an assault by verbally threatening to kill Erin. A person commits an assault if the person intentionally or knowingly threatens another with imminent bodily injury. Tex. Penal Code Ann. § 22.01(a)(2) (West Supp. 2014). Finally, the State could have proven its case by showing Appellant entered the house and thereafter assaulted Noah.

During opening arguments, the State did not mention any verbal threats against Erin. Instead, the State argued the evidence would show Appellant assaulted Noah inside the garage. During final arguments, the State relied upon the alleged verbal threats both as a means to determine Appellant's intent when entering Erin's home and as an assault once Appellant was inside the home. At the same time, the State relied upon Appellant's assaulting Noah. The first prosecutor said,

> And you all 12 don't have to agree on which way assault was committed. If 6 of you think that he committed assault by threatening imminent bodily injury and if the other 6 of you agree that he committed assault by causing bodily injury, then you all 12

24

agree that he committed an assault. You don't all have to agree on how he did it; you just all have to agree that he did it.

The second prosecutor underscored the first prosecutor's argument, "I don't have to prove which victim was going to be assaulted. It can be anyone, one of them. You don't have to agree which one."

Because Appellant admitted striking Noah, without the self-defense instruction, Appellant admitted the offense. The error was harmful as to the third basis. *See Johnson*, 271 S.W.3d at 368 ("Because appellant admitted that she intentionally stabbed T.L.B. to stop him from jumping on her or hitting her, and the jury was not instructed to consider appellant's statutory defensive theory that was sufficiently raised by the evidence, the jury had no choice but to convict appellant of murder.") The error, however, would be harmless as to the first two bases, as self-defense played no role in either of those. Unfortunately, we are not able to tell which of the three theories the jury relied on. We are able to conclude, however, that if even one juror relied on the third basis involving Noah, Appellant was harmed. "[A]ny harm, regardless of degree," is sufficient to require reversal. *See Arline*, 721 S.W.2d at 351. "Unless *all* harm was abated, appellant suffered 'some' harm." *Miller v. State*, 815 S.W.2d 582, 586 n.5 (Tex. Crim. App. 1991). We, therefore, hold Appellant suffered some harm by the failure to submit the self-defense instruction. We overrule Appellant's first issue with respect to the defense of necessity, but we sustain it with respect to the justification issue of self-defense.

**Conclusion**

Having sustained Appellant's first issue in part, we need not address his other four issues. *See* Tex. R. App. P. 47.1. We reverse the trial court's judgment and remand the cause for a new trial.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and GABRIEL, JJ.

LIVINGSTON, C.J. and GABRIEL, J. concur without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 2, 2015